UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-1099 (DSD/JMM)

McNeilus Truck and Manufacturing, Inc., a Minnesota Corporation,

Plaintiff,

v.

**ORDER**

Byron Hunt,

Defendant.

Gerald S. Duffy, Esq., Brenna E. Nelson, Esq., and Siegel, Brill, Greupner, Duffy & Foster, 1300 Washington Square, 100 Washington Avenue South, Minneapolis, MN 55401, counsel for plaintiff.

Ken D. Schueler, Esq., Sharon Zehe, Esq., and Dunlap & Seeger, 206 South Broadway, Suite 505, Rochester, MN 55903, counsel for defendant.

This matter is before the court on plaintiff's motion for a preliminary injunction. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court grants the motion in part and denies the motion in part.

## BACKGROUND

Byron Hunt ("Hunt") was hired by McNeilus Truck and Manufacturing, Inc. ("McNeilus") as a sales representative in 1982. (Nelson Aff. Ex. A.) Hunt received various promotions and was working in the position of Southern California branch manager for

FILED 8-15-01
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. ____________
Deputy Clerk's Initials ______

McNeilus when he voluntarily terminated his employment in August 1985. (6/01 Hunt Aff. ¶¶ 2-3.)

In 1989, Hunt was rehired by McNeilus and resumed employment as a branch manager for the southeastern United States. (Id. ¶ 4.) On June 19, 1989, Hunt signed an employment agreement which contains a noncompete clause asserting that if Hunt left the employ of McNeilus he could not sell concrete mixers and dump trucks within the southeastern region for a period of five years from the date of termination. (Nelson Aff. Ex. B at 5.) The agreement also provides that if Hunt "transferred among" McNeilus Truck and Manufacturing, Inc., a Minnesota corporation, and McNeilus Financial Inc., a Texas corporation, the terms and conditions of the employment agreement and noncompete clause would remain in effect for two years after the date of transfer. (Id.) Finally, the agreement states that if a new territory was assigned to Hunt, the noncompete clause would extend to cover the new territory. (Id. at 5-6.)

The entire employment agreement, including the noncompete clause, was nearly identical to the agreement that Hunt signed when he was first hired by McNeilus in 1982. (Nelson Aff. Ex. A.) In both instances, Hunt signed the agreement without objection. (Garwin McNeilus Aff. ¶ 10.)

In the spring of 1992, Hunt was promoted to southern regional manager, which added the Dallas branch office to his territory.

(6/01 Hunt Aff. ¶ 6.) In April 1997, Hunt was made a vice president and regional manager and the Ohio branch was added to his supervised territory. (Id.) In October 1998, following the sale of the McNeilus companies to Oshkosh Truck Corp., Hunt's title was changed to vice president of branch operations. (6/01 Hunt Aff. ¶ 8; Hunt dep. at 77-83.) The new corporate president, Dan Lanzdorf, advised Hunt to begin focusing less on sales and more on branch operations. (6/01 Hunt Aff. ¶ 8.)

In early September 1999, Lanzdorf informed Hunt that his position would be abolished. Lanzdorf offered Hunt an alternative position at a compensation of less than one-half his current pay. (Id. ¶ 9; Lanzdorf Aff. ¶ 2.) Hunt decided to resign rather than take the alternative position. (6/01 Hunt Aff. ¶ 9; Lanzdorf Aff. ¶ 4.) However, Lanzdorf agreed to let Hunt stay on the payroll through December 6, 1999, so that he could collect his annual bonus. (6/01 Hunt Aff. ¶ 9; Lanzdorf Aff. ¶ 5.) After his resignation, Hunt worked in various jobs until May 9, 2001, when he began working for Continental Manufacturing Co., Inc., ("Continental"), a competitor of McNeilus.

On June 11, 2001, McNeilus filed suit in Dodge County District Court asserting that Hunt, through his employment with Continental, is breaching his noncompete agreement and misappropriating trade secrets. The suit was removed to federal district court on June 18, 2001. McNeilus now moves for preliminary injunction, arguing

that injunctive relief is appropriate and necessary to prevent ongoing harm to McNeilus pending the completion of this litigation.[1]

**DISCUSSION**

In evaluating a motion for preliminary injunction, the court considers the four factors set forth by the Eighth Circuit Court of Appeals in Dataphase Systems, Inc. v. CL Systems, Inc.: (1) the threat of irreparable harm to the movant in the absence of relief; (2) the balance between that harm and the harm that the relief would cause to the other litigants; (3) the likelihood of the movant's success on the merits; and (4) the public interest. 640 F.2d 109, 112-114 (8th Cir. 1981). The court balances the four factors to determine whether injunctive relief is warranted. Id. at 113; West Publ'g Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222 (8th Cir. 1986), cert. denied, 479 U.S. 1070 (1987). The plaintiff bears the burden of proof concerning each of them. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

[1] On June 12, 2001, the Dodge County District Court issued an ex parte temporary restraining order enjoining Hunt from "working with any business similar to or in competition with McNeilus in the United States." (6/12/01 Temp. Rest. Order.) Hunt removed the case to federal district court on June 18, 2001 and filed a motion to modify or dissolve the TRO. McNeilus subsequently filed a motion to remand the case to state court. On July 23, 2001, this court denied the motion to remand and denied the motion to dissolve the ex parte TRO as moot. (Doc. No. 24.)

**A. Likelihood of Success on the Merits**

McNeilus contends that a preliminary injunction is warranted due to Hunt's alleged breach of the noncompete agreement and also his alleged misappropriation of trade secrets. The court will address McNeilus's likelihood of success on each claim in turn.

**1. Noncompete Agreement**

Noncompete agreements "are looked upon with disfavor, cautiously considered, and carefully scrutinized" because such agreements decrease competition and restrict an individual's right to work and earn a livelihood. Bennett v. Storz Broadcasting Co., 134 N.W.2d 892, 898 (Minn. 1965); see also Freeman v. Duluth Clinic, Ltd., 334 N.W.2d 626, 630 (Minn. 1983). A primary consideration in evaluating a noncompete agreement is whether the agreement has been bargained for and "provide[s] the employee with real advantages." Satellite Indus., Inc. v. Keeling, 396 N.W.2d 635, 639 (Minn. Ct. App. 1986). If the noncompete agreement is part of the original employment contract, then no independent consideration is necessary. Overholt Crop Ins. Serv. Co. v. Bredeson, 437 N.W.2d 698, 702 (Minn. Ct. App. 1989). However, if the terms of the noncompete agreement are not disclosed until after the employee has started work, the agreement may not be invalid unless it is supported by independent consideration. Sanborn Mfg. Co. v. Currie, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993)(citing

National Recruiters, Inc. v. Cashman, 323 N.W.2d 736, 741 (Minn. 1982)).

Hunt asserts that two McNeilus representatives, former senior vice president Tom Harris and the company's owner Garwin McNeilus, offered him a job which he accepted in early June 1999. He claims he then quit his old job and arrived in Minnesota on June 18, 1989, ready to begin his new job. He reported for duty on June 19, 1989, at which time he was presented with a written employment contract containing a noncompete agreement. (Hunt dep. at 27-41.)

If this is true, there is authority for the court to deem the noncompete agreement invalid because it was executed after Hunt had accepted a firm offer of employment with McNeilus and, on its face, was not supported by independent consideration. See Sanborn, 500 N.W.2d at 164 (concluding that where the prior offer of employment was clear and unequivocal, once the employee had orally accepted the employer's first offer, the parties had entered into an enforceable employment agreement and any further agreement required independent consideration); see also National Recruiters, 323 N.W.2d at 741 (holding that where the parties had completed negotiations on compensation, duties, benefits and other terms of employment, they had formed an employment agreement and any addition to that agreement, such as a noncompete clause, would require independent consideration).

On the other hand, Thomas Winkels, former senior vice president for McNeilus asserted by affidavit that, while McNeilus came to Minnesota "wanting to accept this job," the employment agreement was not consummated until June 19, 1999.

> When Garwin McNeilus told him that we wanted him for the job, Hunt was told that he needed to come up and talk to Denzil McNeilus and me [Winkels] and we would work out the details. Garwin told him to bring his clothes and be prepared to work if he was willing to work through the details. Some of those details are the employment agreement and other paperwork. Garwin McNeilus talked generally about what the job involved and when Hunt came to Dodge Center, we sat down and went through the specifics with him.

Winkels Aff. ¶ 5.

If Winkels is correct, then the noncompete agreement is part and parcel of the original employment agreement and no further consideration is necessary. Neither party elaborates the key details of the discussions between Hunt and Harris in late May and early June, 1999 and the follow up conversations between Hunt and Garwin McNeilus. Specifically, the record gives no indication of whether the basic terms of the employment agreement, including Hunt's job duties and compensation, were discussed and mutually agreed upon prior to Hunt's decision to quit his job and come to Minnesota. As a result, the court must conclude that issues of disputed material fact remain regarding the timing and nature of the initial employment agreement and its relationship to the noncompete agreement.

At the preliminary injunction stage, a district court is not required to resolve "doubtful questions of law or disputed questions of fact." International Molders' & Allied Workers' Local Union v. Nelson, 799 F.2d 547, 551 (9th Cir. 1986). Therefore, the court cannot determine at this juncture whether Hunt was presented with the noncompete clause after the initial rehiring negotiations had concluded or on the same day that he was officially rehired by McNeilus, and thus, whether additional consideration was required or not.

Nevertheless, the adequacy of consideration for a noncompete contract in an ongoing business relationship is to be determined on a case-by-case basis, and in some instances, such as where the employee derives substantial economic or professional benefits from his continuing employment, the mere continuation of employment may serve as sufficient consideration. Davies & Davies Agency, Inc. v. Davies, 298 N.W.2d 127, 130-31 (Minn. 1980). In Davies, the Minnesota Supreme Court held that where the employee had continued his employment for ten years after signing the noncompete agreement, received professional training and advanced to positions in the company which would not have been open to him had he not entered into the employment agreement, including positions where he was solely responsible for certain customers, there was adequate consideration to support the noncompete agreement even though the

agreement was executed four months after the employee began working. Id.

Hunt attempts to distinguish his situation from the facts in Davies, arguing that he eventually moved out of direct sales and had less contact with customers than the employee in Davies. That distinction is insignificant in light of the fact that, during the thirteen years that Hunt worked for McNeilus, he received extensive on-the-job training in the sales of cement mixers and refuse packers. He was privy to confidential information regarding customer needs and pricing structures and was provided a large annual budget for customer development. His increasing knowledge of company operations and customer needs enabled him to move up the corporate ladder from sales representative to regional manager to vice president of branch operations. McNeilus representatives testified unequivocally that had Hunt refused to sign the noncompete agreement in 1989, he would not have been rehired and would not have obtained these benefits. (Eckstein Aff. ¶ 2; Winkels Aff. ¶ 3; D. McNeilus Aff. ¶ 6).

In sum, the professional opportunities and advancement obtained through ten years of continuing employment constituted "a real advantage bargained for in consideration of signing the contract." National Recruiters, 323 N.W.2d at 741; see also Satellite Indus., 396 N.W.2d at 639 (finding that an 11-year career which included steady advancement to vice president of sales and

substantial industry and product training constituted adequate consideration). Cf. Jostens, Inc. v. National Computer Sys., Inc., 318 N.W.2d 691, 703 (Minn. 1982)(holding that where no raises or promotions resulted and where other employees with similar access to confidential information were not asked to sign restrictive covenants, the mere continuation of employment was insufficient consideration to support a noncompete agreement). Therefore, regardless of whether the noncompete agreement in this case comprised an additional agreement made after Hunt was officially hired by McNeilus or whether it was part of the original employment contract, the agreement is supported by adequate consideration.

The consideration inquiry is only one part of the court's analysis of the validity of a noncompete agreement. In addition, the court must determine whether: (1) the restriction is reasonable in light of the nature and scope of the employer's business, and (2) the legitimate interest of the employer is greater than that of the employee. Webb Publ'g Co. v. Fosshage, 426 N.W.2d 445, 449-50 (Minn. Ct. App. 1988); see also Satellite Indus., 396 N.W.2d at 639-40.

In Bennett v. Storz Broadcasting Co., the Minnesota Supreme Court articulated the following test for evaluating the reasonableness of a noncompete agreement:

> The test applied is whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the stipulation has imposed

> upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

134 N.W.2d at 899. Minnesota also recognizes the "blue pencil doctrine" which allows a court to modify an unreasonable noncompete agreement and enforce it only to the extent that it is reasonable. Davies, 298 N.W.2d at 131 n.1.

The noncompete clause in the employment agreement signed by Hunt prevents him from selling concrete mixers and refuse packers within the southeastern region for a period of five years from the date of termination. Hunt's promotions in 1992 and 1997 ostensibly bring the Dallas branch office and Ohio branch offices into the geographic scope of the agreement. McNeilus contends that Hunt's 1998 promotion to vice president for branch operations confers a nationwide scope to the restriction. However, Hunt argues that these promotions reduced his direct contact with customers, making any geographic restriction unreasonable. Hunt further argues that even if a limited geographic restriction were reasonable, the five-year restriction is overbroad.

While it may be true that Hunt's direct contact with customers declined as he rose in the corporate management structure, fellow branch managers and sales representatives who worked with Hunt uniformly assert that Hunt was intimately involved in all sales

consummated in his region. For example, sales representatives under his supervision in Texas and Georgia branches were required to contact Hunt for his approval of pricing structure and discounting. (O'Neal Aff. ¶ 9; Parrish Aff. ¶¶ 2, 6.) In addition, Hunt continued to call on customers after he became regional manager, (O'Neal Aff. ¶ 5), and he allegedly retained primary responsibility for one of McNeilus's major customers in the southeast in the years up to and including 1999. (Miller Aff. ¶ 3).

Terry Eckstein, McNeilus's human resources director, also confirms that Hunt's direct contact with customers continued even after he was given the title of vice president of branch operations up to his resignation in September 1999. (Eckstein Aff. ¶ 5, Ex. D.) Eckstein compiled a list documenting that in 1998 and 1999 Hunt traveled to various locations to make personal calls on customers and also visited regional and national trade shows and meetings throughout the country, where he had direct contact with many McNeilus customers. (Eckstein Aff. ¶ 5, Ex. D; see also Miller Aff. ¶ 3; O'Neal Aff. ¶ 19.) Hunt also accompanied customers to Minnesota headquarters to close deals, with one visit occurring as late as the summer of 1999. (2nd Nelson Aff. Ex. D, Miller dep. at 31.) The goodwill generated by this ongoing personal contact is self-evident.

Finally, McNeilus emphasizes that Hunt attended annual branch operations and review sessions, up to and including the summer of 1999, for each branch under his supervision. At each of these sessions, information about customers needs and purchasing patterns was carefully analyzed and marketing strategies were extensively discussed. Past sales, including lost sales, were recapped and future sales targets were established by customer and product type. (O'Neal Aff. ¶ 18.) As a result of his attendance at these sessions, Hunt was undeniably privy to confidential information about McNeilus's regional sales and marketing efforts that would be valuable to a competitor.

Based on this record, the court must conclude that McNeilus has a protectable interest and some form of restriction is appropriate. D.L. Ricci Corp. v. Forsman, 1998 WL 202595 at *3 (Minn. Ct. App. Apr. 28, 1998) (holding that employer has legitimate interest in protecting the access to sales projections, sales figures, margins figures, pricing calculations, bids, estimates, and other such information); see also Roth v. Gamble-Skogmo, Inc., 532 F. Supp. 1029, 1031 (D. Minn. 1982)(under Minnesota law, a company's goodwill, trade secrets and confidential information are legitimate interests that may be protected by an employer through a noncompete agreement).[2]

---

[2] Hunt notes that after he left McNeilus, a McNeilus branch manager helped him secure a job with LJL Truck Sales, where he sold (continued...)

However, any such protection must be reasonable in geographic and temporal scope, which is not the case with McNeilus noncompete agreement in its original form. For example, apart from McNeilus's bare assertions that Hunt traveled to customer locations around the country, and its references to three sales in California, Washington and the "midwest" (Attachment 1), there is no evidence to support a nationwide scope. McNeilus concedes as much in suggesting that limiting the scope to the three territories which Hunt supervised would be reasonable.

The court also harbors doubt that a restriction in the Ohio region, which was the last to be added to Hunt's responsibilities, is reasonable. Testimony regarding the branch review sessions indicates that Hunt may have had access to confidential customer data from that region. Nevertheless, unlike the southeastern

---

[2](...continued) at least one Mack truck fitted with a Continental mixer. Hunt claims that McNeilus's actions and inactions at that juncture constitute a waiver of its rights under the agreement. However, there is no evidence that the branch manager had the authority to waive the terms of the noncompete agreement and no evidence that anyone who did have such authority was aware of McNeilus's activity at LJL. Moreover, McNeilus contends that LJL primarily sells Mack truck chassis then purchases mixers for placement on the chassis. Therefore, McNeilus argues that, even if its top officials were aware of Hunt's employment at LJL, they would have considered it a good opportunity to sell more of its mixers rather than a competitive threat. (2nd Nelson Aff. Ex. D - Miller dep. at 196). The court understands that LJL vigorously disputes these assertions. See Barrows Aff. However, based on the limited factual record on this issue, the court cannot conclude that McNeilus waived its rights or is estopped from asserting its rights under the noncompete agreement.

region, where Hunt lived and where he began his career with McNeilus, Hunt was involved with the Ohio branch for only two years, from April 1997 until his resignation in September 1999. This limited tenure may explain why there are no affidavits from individuals who worked with Hunt in the Ohio branch which describe his activity in that area and no mention of his contact with customers in the states encompassed by that region (Ohio, Michigan, Indiana and parts of Kentucky, Pennsylvania, New York and West Virginia). Absent evidence proving that Hunt had meaningful contact with customers and customer data from that region, the court cannot at this time include the Ohio branch in the restrictions.

By contrast, the extensive record of Hunt's continuing contact with, and receipt of confidential information about, customers from the Georgia and Texas branches justifies a restriction in those two areas. See Overholt, 437 N.W.2d at 703 (limiting geographical scope to area in which appellant worked for employer). Therefore, the court modifies the agreement by limiting its restrictive scope to the states encompassed by the Georgia and Texas branch offices.

With respect to an appropriate time limitation, the reasonableness of the temporal restriction typically depends on the nature of the job, the amount of time necessary to find and train a replacement for the employee and the amount of time necessary for the employee's customers to become accustomed to the employee's

replacement. Dean Van Horn Consulting Assoc., Inc. v. Wold, 395 N.W.2d 405, 408-409 (Minn. Ct. App. 1986). As the presence of a factor test suggests, the factually intensive nature of the reasonableness inquiry precludes a bright-line rule for determining an appropriate temporal scope. For example, some cases have upheld three-year temporal restrictions, while others have rejected them. Compare B & Y Metal Painting Inc. v. Ball, 279 N.W.2d 813, 815 (Minn. 1979) (finding a three-year restriction reasonable where the covenant not to compete arose out of both a sale of business and an employment contract with the purchaser, the seller's attorney drafted both the covenant not to compete and the employment contract, and the seller signed the covenant as part of the sale), with Dean Van Horn, 395 N.W.2d at 409 (blue penciling a three-year restriction to one year where the employer wrote to each of its customers alerting them to the termination of its relationship with the former employee), and Klick v. Crosstown State Bank, Inc., 372 N.W.2d 85, 88 (Minn. Ct. App. 1985) (holding a three-year restriction unreasonable where the former employee never developed any special relationships with customers).

As the court has already concluded, Hunt clearly enjoyed extensive contact with McNeilus customers in a variety of settings. During his thirteen years with McNeilus, he engaged clients as a sales representative, then as a branch manager and finally as a high ranking company official responsible for decisions regarding

pricing structure, customer discounts and long-term sales strategies. He traveled extensively to meet with clients at their places of business and at trade shows around the country and he was handsomely rewarded for his ability to generate considerable goodwill for the company.

However, as Hunt emphasizes, the position which he occupied since 1998 was not designated as a direct sales position and when he was promoted to vice president of branch operations, he was instructed to reduce his sales calling activity. Moreover, because this position was later eliminated and the sales structure at McNeilus was already in place, there was no need to replace Hunt. For this reason, it strikes the court as somewhat disingenuous for McNeilus to suggest that it will take five years for the individual or individuals who replace Hunt to establish themselves and develop the close working relationships with the customers with whom Hunt worked during his tenure at the company. In addition, the court notes that Hunt did not begin work for Continental until almost two years after he resigned from McNeilus, which gave McNeilus an significant jump on firming up its connections with customers before Hunt's reentry into the industry.

One additional consideration warrants mention here. An employer who expends considerable time, effort and money in training a professional sales force should be afforded protection when an employee resigns or is lured away by a competitor, then

attempts to pirate away its clients. However, in this case, where McNeilus hired a man right out of college, brought him up through its corporate ranks, then essentially forced him out when his high salary became a topic of concern with the new owners of the business, fairness and equity mandate that McNeilus bear the brunt of its actions.

Therefore, the court concludes that a two-year restriction strikes the appropriate balance between protecting McNeilus's business interests in its goodwill and confidential client information but allowing Hunt to return to the field in which he can best utilize the knowledge and skills he acquired during his thirteen years in the industry.

An issue arises as to when the two-year clock begins to run. Hunt resigned from his position with McNeilus in September of 1999 and moved out of his office on October 1, 1999. He remained on the payroll until December 6, 1999, at which time he collected his bonus and officially terminated his association with McNeilus. McNeilus alleges that Hunt continued to work out of his home, but there is no evidence that he met with any customers or received additional customer data during his final two months at McNeilus. In fact, in its supplement brief, McNeilus asserts that it paid Hunt $164,000 "to do nothing for the last three months of his employment." (Pltf.'s Reply Mem. at 7; see also 2nd Nelson Aff. Ex. C, Lanzdorf dep. at 74.) Under these circumstances, the court

believes that October 1, 1999 is an appropriate date to mark the termination of the noncompete clause, therefore the agreement as modified will extend until October 1, 2001.[3]

### 2. Trade Secrets Claim

McNeilus also asks the court to enjoin Hunt from working at Continental on the grounds that it is likely to succeed on its trade secrets claim against him. The Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §§ 325C.01-325C.08, protects certain types of information by creating a right of action for misappropriation. Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897-98 (Minn. 1983). Misappropriation is defined as improper acquisition, disclosure, or use of a "trade secret." Minn. Stat. § 325C.01, subd. 3. Without a proven trade secret there can be no action for misappropriation, even if defendant's actions were wrongful. Electro-Craft, 332 N.W.2d at 897. To qualify as a trade secret under the act, the information: (1) must

[3] Hunt contends that the temporal scope is self-limited in this case by the provision in the noncompete clause which states that if Hunt transferred among McNeilus Truck and Manufacturing, Inc., a Minnesota corporation, and McNeilus Financial Inc., a Texas corporation, the terms and conditions of the employment agreement and noncompete clause would remain in effect for only two years after the date of transfer. Hunt asserts that he was working for McNeilus Financial when he resigned, however, the record does not establish that Hunt "transfer[red] among" the two corporations. Rather, Hunt merely asserts by affidavit that he assisted some customers in obtaining lease financing through McNeilus Financial and was compensated for securing leases for McNeilus Financial. (6/01 Hunt Aff. ¶ 7). This assertion, without more, does not compel application of the transfer provision.

not be generally known nor readily ascertainable; (2) must derive independent economic value from secrecy; and (3) must be the subject of reasonable efforts to maintain its secrecy. Minn. Stat. § 325C.01, subd. 5; Electro-Craft, 332 N.W.2d at 899-900.

McNeilus asserts that its proprietary materials include customer lists, customer files, marketing plans and financial reviews, which, taken together, contain not only customer names but also specific information about each customer's buying patterns and the company's strategies for future sales. McNeilus asserts that it has taken years to collect and compile this detailed information which would be unavailable to Continental but through Hunt.

This information likely has monetary value to McNeilus, in that it would lose value if Continental could obtain the information through Hunt. Electro-Craft, 332 N.W. 2d at 900-01. However, customer lists and associated historical purchasing and financial data are rarely afforded trade secret protection because more often than not such information "'comprises general skills and knowledge acquired in the course of employment. Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations or analyses.'" Lasermaster Corp. v. Sentinal Imaging, 931 F. Supp. 628, 637 (D. Minn. 1996) (quoting Fleming Sales Co. v. Bailey, 611 F. Supp. 507, 514 (N.D. Ill. 1985)). McNeilus points to branch review documents as evidence that such data was analyzed

and preserved in written form, however, there is no evidence that Hunt ever had possession of such documentation or that he took it with him when he resigned from McNeilus.

McNeilus also claims that Hunt has knowledge of confidential truck and mixer specifications, including details regarding the design and construction of the differential lock system, voltage suppressed power supply, wheel and cut steering systems, torque specs on the ZF gearbox, the counterbalance valves on the Bridgemaster and wiring system data. (2nd Nelson Aff. Ex. B, Harris dep. at 29-64.) Such specifications may, under certain circumstances, constitute a trade secret. However, even assuming Hunt has mastered the long list of specifications that McNeilus seeks to protect here, there is a vast difference in understanding this data from a sales perspective and comprehending it from an engineering perspective. Hunt has no engineering training and there is no evidence that he ever provided schematic drawings or transmitted any of his knowledge, such as it is, to Continental engineers.

Moreover, McNeilus cannot establish that it has exerted any attempt to maintain the secrecy of these alleged trade secrets. McNeilus representatives have testified that confidentiality agreements are not required in its dealings with either the suppliers or the customers of many of these parts. For example, the ZF gearbox is manufactured by another company and sold not only

to McNeilus but to other companies. McNeilus contends that it configures its gearbox with a specific gear ratio, however it is undisputed that if a competitor ordered the gearbox and requested the same gears and ratios that McNeilus uses, there is nothing to prohibit the manufacturer from filling the order. (Id. at 46-47.) Similarly, the differential lock sensor used on McNeilus trucks and promoted to customers is manufactured by Mack Trucks and there are no confidentiality agreements or other measures to prevent Mack from supplying trucks to McNeilus competitors with the same or similar specifications. (Id. at 35-36.)

Other purportedly confidential design specifications, such as barrel thickness, barrel fin design, wear plates and location of chassis cross members are readily observable. In some instances, McNeilus even publishes detailed schematics in order to assist customers in installing parts or ordering replacement parts. (Schueler Aff. Ex. G, H.) While no expert affidavits are before the court on this point, it seems likely that these schematics would greatly facilitate any attempt to reverse engineer a McNeilus cement mixer drum. Finally, with respect to the allegedly secret jig designs, McNeilus admits that employees are allowed to work on the jigs without signing a confidentiality agreement, (2nd Nelson Aff. Ex. C, Lanzdorf dep. at 180), and that neither the customers nor family members who occasionally tour the plant are required to sign confidentiality agreements, (id. at 180-182).

In sum, McNeilus has failed at this juncture to demonstrate that the information which it seeks to protect is not readily ascertainable and that it has taken reasonable measures to preserve the confidential nature of its allegedly propriety information. See Electro-Craft, 332 N.W.2d at 901-03 (holding that where only some employees were required to sign confidentiality agreements, many entrances were unlocked, and there was no company policy statement delineating material to be kept confidential, the evidence was insufficient to prove the employer took reasonable efforts to maintain security); Ring Computer Sys., Inc. v. Paradata Computer Networks, Inc., 1990 WL 132615 (Minn. Ct. App. Sept. 18, 1990) (holding that employer failed to make reasonable efforts to maintain secrecy when the only measure it took to protect its confidential information was to ask its employees to sign a confidentiality agreement). For these reasons, the court concludes that McNeilus is not likely to succeed on the merits of its trade secrets claim, therefore preliminary injunction on this basis is not warranted.

**B. Irreparable Harm**

The fact that a former employee begins work for a competitor is insufficient, standing alone, to infer irreparable harm. See Menter Co. v. Brock, 180 N.W. 553, 554 (Minn. 1920) (holding injury not shown by mere fact employee enters employ of rival concern). However, irreparable injury can be inferred from the breach of a

noncompete agreement if the former employee comes into contact with the employer's customers "in a way which obtains a personal hold on the good will of the business." Webb, 426 N.W.2d at 448.

As discussed above, Hunt had access to and knowledge of information regarding the needs and past buying patterns of McNeilus's customers, pricing information and future sales strategies. Such information would obviously assist Continental in any attempt to underbid McNeilus with any of the hundreds of potential customers throughout the United States. Although any harm to McNeilus may be compensable by an award of monetary damages, the court believes that injunctive relief is the most practical way to protect McNeilus's business interests.

**C. Other Dataphase Factors**

The public has an interest in enforcing valid noncompete agreements which protect a business's hard-earned good will. Lexis Nexis v. Beer, 41 F. Supp. 2d 950 (D. Minn. 1999). However, a strong public interest also exists in ensuring that companies such as McNeilus and Continental are allowed to freely compete in the marketplace. Lasermaster, 931 F. Supp. at 638. In this case, the noncompete agreement, as modified, is narrowly tailored to balance such interests by safeguarding McNeilus's accumulated knowledge regarding its customers preferences while allowing a skilled salesmen like Hunt the opportunity to earn a living in and bring value to the trade he knows best. Hunt will be precluded from

selling Continental products for a reasonable time period in the region where he was most active during his tenure at McNeilus. However, because the court has eliminated the nationwide scope of the agreement, Hunt presumably will be able sell trucks for Continental in other areas of the country while the restrictions are still effect. In addition, the temporal scope has been reduced to a two-year period, which the court believes strikes a more reasonable balance of interests under the circumstances of this case. Therefore, the court concludes that the limited injunction, in toto, will allow McNeilus to solidify its position in the market and at the same time not cause significant harm to Hunt, or by extension to Continental.

**D. Bond**

Because of the nature of this dispute and the fact that the injunction will expire in less than two months, no bond will be required in this case.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for a preliminary injunction is granted in part and denied in part.

2. Pursuant to the terms of the noncompete agreement, as modified by the court herein, defendant Byron Hunt will not "engage or be interested in directly or indirectly as employer, employee,

principal, agent, financier, partner, stockholder, advisor, beneficiary, or otherwise in any capacity or relationship whatsoever, in the manufacturing, leasing, sales or distribution of any and all makes, models or types of motor vehicle cement mixers or component parts thereof, dump trucks, or winch rigs or rig-ups or component parts thereof, or in any business activities similar thereto, competitive with those of Employer [McNeilus], its subsidiaries or affiliates" for a period of two years from October 1, 1999, within the states encompassed by McNeilus's Georgia and Texas branches.

Dated: August 14, 2001

David S. Doty, Judge
United States District Court

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

**For additional information on either program please visit our website at www.mnd.uscourts.gov.**

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500